A06A1467. IN THE INTEREST OF J. D., a child.

(635 SE2d 226)

BLACKBURN, Presiding Judge.

Following a hearing, the juvenile court of Lowndes County terminated the parental rights of the mother of three-year-old J. D. The mother appeals, contending that the juvenile court erred in terminating her parental rights because there was (1) insufficient evidence demonstrating parental misconduct or inability, and (2) insufficient evidence showing that a termination of her parental rights was in the best interest of the child. For the reasons set forth below, we affirm.

In reviewing a termination of parental rights, we determine, after viewing the evidence in the light most favorable to the lower court's judgment, whether "any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost." *In the Interest of F. C.*[1] "This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met." *In the Interest of R. N.*[2]

So viewed, the evidence shows that in early May 2003, the Department of Family and Children Services ("DFCS") received a complaint from the mother's mother (J. D.'s grandmother) that the mother was providing inadequate care and supervision for the then 16-month-old J. D. DFCS contacted the mother and the mother informed them that she did not want to parent J. D. DFCS tried to place J. D. with another family member but was unsuccessful. Later that month, the grandmother brought J. D. to a DFCS office and requested placement in foster care until the mother could learn to care for the child. The juvenile court issued a shelter care order and took J. D. into protective custody.

In late May 2003, the juvenile court held a deprivation hearing and found that J. D. was deprived due to the fact that the mother admitted to not wanting to be a parent; that the mother acted in a way

---

[1] *In the Interest of F. C.*, 248 Ga. App. 675 (549 SE2d 125) (2001).

[2] *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

contrary to the best interest of J. D.'s safety and well-being; and that the mother had been involved with the Department of Juvenile Justice ("DJJ"). A reunification case plan was established, requiring the mother to: obtain a stable income and housing; ensure proper supervision of J. D.; complete parenting and anger management classes; cooperate with DFCS's wrap-around services; obtain a psychological evaluation and comply with any recommended treatments; avoid further involvement with the DJJ; attend all hearings, appointments, and visitations; and obtain a high school diploma.

The mother attended a required psychotherapy session, and the psychologist recommended further counseling to address family and anger issues, but the mother failed to comply. Additionally, DFCS set up in-home parental counseling, which the mother never began. Between June 2003 and June 2004, the mother visited J. D. a total of four times, and in fact, moved from Valdosta to Atlanta to attend Job Corps in August 2003. While attending Job Corps, the mother became pregnant and gave birth to her second child in August 2004. In June 2004, the juvenile court found that due to the mother's failure to comply with the reunification plan, including her lack of regular visitation, further reunification efforts would be detrimental to J. D. Consequently, the court prohibited the mother's further visitation with J. D. and approved J. D.'s eligibility for adoption. Between June 2004 and June 2005, the mother made no further attempts to contact J. D. nor did she comply with the reunification goals.

In November 2004, DFCS filed a petition to terminate the mother's parental rights, and in June 2005, following a hearing, the juvenile court found that the mother's conduct amounted to parental misconduct or inability and that it was in J. D.'s best interest to terminate the mother's parental rights. This appeal followed.

1. *Parental Misconduct or Inability.* The mother contends that there is insufficient evidence demonstrating her parental misconduct or inability. The Georgia Code sets out a two-step process governing a court's termination of parental rights. The first step requires a finding of parental misconduct or inability.[3] In order to satisfy this requirement, the court must find by clear and convincing evidence that: (1) the child is deprived; (2) lack of parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. *In the Interest of T. F.*[4] Once these factors are satisfied, the court must then decide "whether termination of parental rights is in the child's

---

[3] OCGA § 15-11-94 (b) (4) (A).
[4] *In the Interest of T. F.*, 250 Ga. App. 96, 98 (1) (550 SE2d 473) (2001).

best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home." Id.

(a) *Deprivation.* OCGA § 15-11-2 in part provides that a child is deprived when the child is "without proper parental care or control."[5] Here, the juvenile court first adjudicated J. D. deprived by virtue of the mother's admission that she did not want to parent the child, that she acted contrary to the child's best interest, and that she had been placed under house arrest by the Department of Juvenile Justice after two arrests for assault. The court again adjudicated J. D. deprived at a custody extension hearing in June 2004 because the mother had failed to comply with her reunification plan goals, including maintaining contact with J. D. More importantly, by the time of the final termination hearing in June 2005, the mother had made no real progress toward complying with the reunification plan. Accordingly, the trial court properly found that J. D. was deprived.

(b) *Lack of Parental Care or Control Caused Deprivation.* In determining whether a lack of proper parental care or control caused the deprivation, the juvenile court must consider, but is not limited to, the factors listed in OCGA § 15-11-94 (b) (4) (B). In addition to those factors, when the child is no longer in the parent's custody whose rights are at issue, OCGA § 15-11-94 (b) (4) (C) directs the trial court to consider

> whether the parent without justifiable cause failed significantly for a period of one year or longer [i] [to develop and maintain a parental bond] with the child in a meaningful, supportive, parental manner; [ii] to provide for the care and support of the child; and [iii] to comply with a court-ordered plan to reunite the child with the parent.

*In the Interest of H. D. M.*[6]

Here, between June 2003 and June 2004, the mother visited J. D. a total of four times. After the juvenile court terminated her visitation rights, the mother never tried to work toward the possibility of renewed visitation. Moreover, when the mother visited J. D., she showed little or no interest in him. During one visit, the mother's case manager had to personally intervene twice to stop a fight between J. D. and another child. In addition to her failure to maintain regular contact with J. D., after her last visit in September 2003, the mother failed to call and inquire about J. D.'s well-being until September 2004. Accordingly, the juvenile court was warranted in finding that

---

[5] OCGA § 15-11-2 (8) (A).
[6] *In the Interest of H. D. M.*, 241 Ga. App. 805, 806 (1) (527 SE2d 633) (2000).

the mother failed to create and maintain a bond with J. D. See OCGA § 15-11-94 (b) (4) (C) (i). See *In the Interest of H. D. M.*, supra, 241 Ga. App. at 806 (1).

Furthermore, while the juvenile court did not order the mother to pay child support due to her being a minor at the time J. D. was placed in foster care, once the mother turned 18 she was statutorily obligated to provide support to J. D., even in the absence of a court order.[7] See *In the Interest of C. M.*[8] At the termination hearing, the mother admitted that she had never paid any child support even though she received a weekly cash stipend to attend school. The juvenile court was thus justified in finding that the mother's failure to provide J. D. with support while in foster care also contributed to his deprivation. See *In the Interest of L. G.*[9]

Moreover, after DFCS placed J. D. in foster care, a court-ordered reunification plan was adopted by both DFCS and the mother. The case plan contained ten goals that had to be satisfied prior to DFCS returning J. D. The evidence shows, however, that the mother never substantially complied with the reunification plan. She failed to obtain and maintain a source of financial support; obtain and maintain stable, clean, and safe housing; complete parenting and anger management classes; comply with wrap-around services to assist with parenting skills; follow the recommendations of her psychological evaluation; attend all appointments with DFCS, case plan reviews, and scheduled visits with J. D.; and maintain contact with J. D.

Thus, based on the mother's failure to bond with J. D., her failure to provide any monetary support for the past two years, and her failure to complete the reunification plan, "there was clear and convincing evidence that [J. D.'s] deprivation was caused . . . by [the mother's] lack of proper parental care or control." *In the Interest of H. D. M.*, supra, 241 Ga. App. at 807 (1).

(c) *Cause of Deprivation Likely to Continue.* In determining whether the conditions of deprivation are likely to continue, the juvenile court may consider the past conduct of the parent in ascertaining future conduct. *In the Interest of S. T.*[10] Here, the mother failed to achieve almost all of the goals set out in the reunification plan, including visitation with J. D. In fact, the evidence demonstrated that the mother's judgment and ability to care for J. D. had not improved during the time he has been in foster care. During such time, she failed to maintain a job and failed to attend the required

---

[7] OCGA § 19-7-2.

[8] *In the Interest of C. M.*, 275 Ga. App. 719, 721 (2) (621 SE2d 815) (2005).

[9] *In the Interest of L. G.*, 273 Ga. App. 468, 473 (2) (b) (615 SE2d 551) (2005).

[10] *In the Interest of S. T.*, 244 Ga. App. 86, 88 (1) (534 SE2d 813) (2000).

parental and anger management classes. She has not provided any financial support for J. D. and does not currently possess the means to support herself or her second child, instead relying totally on support provided by a battered woman's shelter. More importantly, she failed to establish adequate, stable, and secure housing and is currently living in the battered woman's shelter under claims that her second child's father is "abusive [and] violent."

The mother's testimony that she had an offer of employment and testimony from her mother that she was more mature and ready to handle the responsibility of parenthood does not constitute conclusive evidence of parental fitness in light of the mother's history. See *In the Interest of A. G.*[11] "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact. Further, this Court has held that the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." Id. Similarly, the mother's argument that her ability to care for J. D. is demonstrated by the fact that DFCS allowed her to keep her second child is unpersuasive. After giving birth to her second child, DFCS investigated her living situation to determine whether the mother should be allowed to keep custody of the new child. At the time of the investigation, the mother had arranged to move back with her mother and purchased clothing for the baby with money obtained from the child's father. However, shortly after the mother moved back with her mother, a domestic conflict arose between the two. The mother and the baby then moved out of her mother's home and drifted between the homes of three other people until finally moving into a battered woman's shelter out of fear based on an alleged threat from the second child's father. Given this change in the mother's situation since DFCS's initial investigation, the decision allowing her to keep custody of her second child provides little, if any, support to her contention that the cause of J. D.'s deprivation will not continue.

(d) *Continued Deprivation Likely to Cause Harm to Child.* "The same evidence demonstrating that the children's deprivation is likely to continue also supports a finding that continued deprivation would cause serious physical, mental, or moral harm to the children." (Punctuation omitted.) *In the Interest of L. G.*, supra, 273 Ga. App. at 475 (2) (d). However, such evidence does not automatically support such a finding; instead, there must be evidence in the record that goes beyond showing simply an inability to parent one's children. See *In the Interest of A. T.*[12]

---

[11] *In the Interest of A. G.*, 253 Ga. App. 88, 91 (1) (c) (558 SE2d 62) (2001).
[12] *In the Interest of A. T.*, 271 Ga. App. 470, 473 (610 SE2d 121) (2005).

Here, the mother failed to maintain constant contact with J. D. and failed to work toward renewed visitation after her visitation rights were terminated. Additionally, DFCS case managers testified that no bond existed between the mother and J. D. and that he was at risk of developing emotional behavioral problems if he continued in foster care without permanent placement. Moreover, J. D. has been in the same stable foster care placement since his removal in May 2003, where he has thrived and bonded with the foster parent, even calling her "mother." Indeed, the foster mother testified that she wished to adopt J. D., and the guardian ad litem, as well as one of the DFCS case managers, opined that it would be harmful to remove him from the foster mother. Given the lack of a parental bond between the mother and J. D., combined with evidence that the child adapted well to foster care and that the foster parent wished to adopt the child, the evidence supports the trial court's finding that J. D. would suffer serious harm if returned to the mother. See *In the Interest of J. K.*[13]

2. *Termination Must Be in the Best Interest of the Child.* The mother also contends that there was insufficient evidence showing that terminating her parental rights was in J. D.'s best interest. The same evidence and "factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest." (Punctuation omitted.) *In the Interest of K. N.*[14] Here, the termination of the mother's parental rights is in the best interest of J. D., considering his physical, mental, emotional and moral condition and his "need for a secure and stable home."[15] See *In the Interest of J. K.*, supra, 239 Ga. App. at 146 (1). Accordingly, we affirm the juvenile court's termination of the mother's parental rights to J. D.

*Judgment affirmed. Mikell and Adams, JJ., concur.*

DECIDED JULY 31, 2006.

Michael S. Bennett, Jr., for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Charles R. Reddick, for appellee.

---

[13] *In the Interest of J. K.*, 239 Ga. App. 142, 146 (1) (520 SE2d 19) (1999).
[14] *In the Interest of K. N.*, 272 Ga. App. 45, 54 (b) (611 SE2d 713) (2005).
[15] OCGA § 15-11-94 (a).